## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT BALES,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT<br>OF STATE,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 18-2779 (RC)

## DECLARATION OF ERIC F. STEIN

Pursuant to 28 U.S.C. § 1746, I, Eric F. Stein, declare and state as follows:

1.       I am the Director of the Office of Information Programs and Services ("IPS") of the United States Department of State (the "Department") and have served in this capacity since January 22, 2017. Previously, I was the Acting Co-Director since March 21, 2016. Prior to serving in this capacity, from April 2013, I worked directly for the Department's Deputy Assistant Secretary ("DAS") for Global Information Services ("GIS") and served as a senior advisor and deputy to the DAS on all issues related to GIS' offices and programs, which include IPS.

2.       The core responsibilities of IPS include: (1) responding to records access requests made by the public (including under the FOIA, the Privacy Act, and the mandatory declassification review requirements of the Executive Order governing classified national security information), by members of Congress, by other government agencies, and those made pursuant to judicial process such as subpoenas, court orders and discovery requests; (2) records management; (3) privacy protection; (4) national security classification management and declassification review;

(5) corporate records archives management; (6) research; (7) operation and management of the Department's library; and (8) technology applications that support these activities.

3.       I am the Department official immediately responsible for responding to requests for records under the Freedom of Information Act (the "FOIA"), 5 U.S.C. § 552, the Privacy Act of 1974, 5 U.S.C. § 552a, and other applicable records access provisions.  As the Director of IPS, I have original classification authority, and I am authorized to classify and declassify national security information.

4.       I make the following statements based upon my personal knowledge, which in turn is based upon information furnished to me in the course of my official duties.  I am familiar with the efforts of Department personnel to process the subject request, including the Department's *Glomar* response.

5.       This declaration explains the Department's processing of Plaintiff's FOIA request.

## I.  ADMINISTRATIVE PROCESSING OF PLAINTIFF'S REQUEST

6.       By letter dated September 18, 2018, Robert Bales ("Plaintiff"), through his attorney, John N. Maher, submitted a FOIA request (**Exhibit 1**) to the United States Department of State ("State" or "the Department") seeking "travel records and biometric data/evidence related to Afghan witnesses the U.S. Army and [State Department] brought to the United States in the Army's court-martial, *United States v. SSG Robert Bales*, Docket Number ARMY 20130743, which occurred on January 17, April 23, June 5, and August 7, 13, and 19-23, 2013."  The timeframe of the request was March 1, 2012, to December 31, 2013.  The request had the following subparts:

  1) All travel records and travel-related documents related to the following seven Afghan witnesses: Mullah Baraan; Hikmatullah; Rafiullah; Haji Baqi; Haji Mohammad Wazir; Dost Mohammad; and Naimatullah.  This part of the request

included requests for visa, passport and other travel-related documents for these witnesses.

2) Any and all emails and/or correspondence between the US Army prosecution and the State Department relating to statements the lead prosecutor made in open court about Mullah Barran being biometrically enrolled and having been a former coalition detainee in Afghanistan.

3) All State Department communications to the Government of the Islamic Republic of Afghanistan concerning SSG Robert Bales after the March 2012 incident in Panjwai in Kandahar province, Afghanistan, but before the August 2013 trial; and all State Department communications to the Government of the Islamic Republic of Afghanistan concerning the United States' position after the trial and sentence.

4) Biometric data pertaining to the Afghan witnesses, including any correspondence between the State Department and I Corps SJA regarding biometric data of the Afghan witnesses.

7.      The Department assigned Plaintiff's FOIA request Case Control Number F-2019-03589.

8.      By letter dated April 11, 2019, IPS informed Plaintiff (**Exhibit 2**) that confirming or denying the existence of any visa records responsive to Plaintiff's request would reveal information exempt from disclosure under Exemption 3 of the FOIA, 5 U.S.C. § 552(b)(3), and, therefore, that the Department could not disclose any visa records or any information concerning the existence or absence of any such records.

9.      By letter dated April 29, 2019, IPS informed Plaintiff (**Exhibit 3**) that it had completed its search for records responsive to all parts of Plaintiff's request that did not implicate information exempt from disclosure under FOIA Exemption 3, and that it found no responsive records.

## II. THE SEARCH PROCESS

10.     When the Department receives a FOIA request, IPS evaluates the request to determine which offices, overseas posts, or other records systems within the Department may reasonably be expected to contain the records requested.  This determination is based on the

description of the records requested and a familiarity with the holdings of the Department's records systems, applicable records disposition schedules, and the substantive and functional mandates of numerous Department offices and Foreign Service posts and missions.

11.     Each office within the Department, as well as each Foreign Service post and mission, maintains files concerning foreign policy and other functional matters related to the daily operations of that office, post, or mission.  These files consist generally of working copies of documents, information copies of documents maintained in the Central Foreign Policy Records collection, and other documents prepared by or furnished to the office in connection with the performance of its official duties, as well as electronic copies of documents and e-mail messages.

12.     When conducting a search in response to a FOIA request, the Department relies on the knowledge and expertise of the employees of each bureau, office, or post to determine the files and locations reasonably likely to house responsive records and the best means of locating such records, as these employees are in the best position to know how their files are organized. Likewise, those employees are also in the best position to determine which search terms would yield potentially responsive records, because they are most knowledgeable about the organization of the records systems in use.

13.     Based on its knowledge of the responsibilities of the various Department components, together with an evaluation of the subject matter of Plaintiff's request, IPS tasked the following Department components to conduct a search for documents, other than visa records, responsive to Plaintiff's FOIA request:

- Bureau of Conflict and Stabilization Operations ("CSO")
- Bureau of Counterterrorism and Countering Violent Extremism ("CT")
- Bureau of Diplomatic Security ("DS")
- Office of Global Criminal Justice ("GCJ")
- Bureau of International Narcotics and Law Enforcement Affairs ("INL")
- Office of the Legal Adviser/Law Enforcement and Intelligence ("L/LEI")

- Office of the Legal Adviser/Political-Military Affairs ("L/PM")
- Bureau of South and Central Asian Affairs ("SCA")
- Office to Monitor and Combat Trafficking in Persons ("TIP")
- The U.S. Embassy in Kabul, Afghanistan

An IPS Government Information Specialist also determined that the following Department records systems were reasonably like to contain responsive records:

- Department's retired files
- State Archiving System ("SAS")

14.     The following components advised IPS that they were not reasonably likely to maintain records responsive to Plaintiff's request: CSO, CT, GCJ, INL, L/LEI, L/PM, and TIP. The following components and records systems were searched for records responsive to Plaintiff's request:  DS, SCA, the U.S. Embassy in Kabul, the Department's retired files, and SAS.  A description of these searches follows.

### Bureau of Diplomatic Security

15.     The Bureau of Diplomatic Security ("DS") is responsible for providing a safe and secure environment for the conduct of U.S. foreign policy.  Every diplomatic mission in the world operates under a security program designated and maintained by DS.  In the United States, some of DS's responsibilities include: investigation of passport and visa fraud; conducting personnel security investigations; and protection of the Secretary of State and high-ranking foreign dignitaries and officials visiting the United States.  DS also trains foreign civilian law enforcement officers in disciplines designated to reduce the threat and repercussions of terrorism throughout the world.

16.    An analyst in DS, who was knowledgeable of the FOIA request at issue and the DS records systems, conducted a search of the Investigative Management System ("IMS"),[1] using the following search terms:

- "Mullah Baran"
- "Hikmatullah"
- "Rafiullah"
- "Haji Baqi"
- "Haji Mohammad Wazir"
- "Dost Mohammad"
- "Naimatullah"
- "Robert Bales"

17.    The search was limited to the date range, March 1, 2012, through December 31, 2013.  These searches located no responsive records.

### Bureau of South and Central Asian Affairs

18.    The Bureau of South and Central Asian Affairs ("SCA") is responsible for the conduct of U.S. foreign policy and U.S. relations with the countries of Afghanistan, Bangladesh, Bhutan, India, Kazakhstan, Kyrgyzstan, Maldives, Nepal, Pakistan, Sri Lanka, Tajikistan, Turkmenistan, and Uzbekistan.  After reviewing Plaintiff's request, the bureau determined that the only office reasonably likely to have responsive records was the Office of Afghanistan Affairs ("SCA/A").

---

[1] IMS is the primary criminal and law enforcement database used by DS.  It is an electronic tracking system used by DS to control and document criminal investigations, and was launched in January 2007. The information stored in the system covers case background, case allegations, case documented interviews, evidence, surveillance videos/audio tapes, pictures, post records and foreign government records, and related investigative information.  There are a number of query fields, with name being the most common.

19.     The Political-Military Desk Officer for Afghanistan, who was knowledgeable of both the FOIA request at issue and SCA's records systems, conducted a search of the unclassified and classified shared drives for SCA/A and Department cables using the following search terms:

- "Mullah Baraan"
- "Hikmatullah
- "Rafiullah"
- "Haji Baqi"
- "Haji Mohammad Wazir"
- "Dost Mohammad"
- "Naimatullah"
- "Robert Bales"

The search was limited to the date range, February 28, 2012, to January 1, 2014.

20.     As a result of these searches, the Department found no records responsive to Plaintiff's request.

**The U.S. Embassy in Kabul, Afghanistan**

21.     In general, U.S. embassies and consulates conduct activities that are aimed at promoting U.S. foreign policy objectives and protecting U.S. interests overseas, including U.S. citizens abroad.  These embassies and consulates employ Foreign Service Officers and Specialists as well as locally employed staff.  Each embassy and consulate has unique staffing patterns and records management systems.

22.     The Unit Chief for the Political-Military Section of the at U.S. Embassy in Kabul, Afghanistan, who was knowledgeable of both the FOIA request at issue and the Embassy's records systems, conducted a search of the Political-Military Section's unclassified and classified shared drives, using the following search terms:

- "Mullah Baraan"
- "Hikmatullah
- "Rafiullah"
- "Haji Baqi"
- "Haji Mohammad Wazir"

- "Dost Mohammad"
- "Naimatullah"
- "Robert Bales"

The search was limited to the date range February 28, 2012, to January 1, 2014.

23.     These searches identified no responsive records.

**Retired Files**

24.     An IPS Government Information Specialist, who was knowledgeable of both Plaintiff's FOIA request and the IPS records systems, conducted a search of the Retired Record Inventory Management System ("RIMS") to identify any retired records responsive to Plaintiff's request. RIMS is a searchable database that automates the processing of records retired to the Records Service Center and tracks the status of all materials received at the Records Service Center from the point of receipt to ultimate disposition. IPS analysts can search both the full-text of the retired file manifests as well as the metadata (i.e., database fields) in the RIMS database. The retired file manifests serve as an index of the contents of retired paper and electronic files and are used to direct a researcher to particular retired files. On occasion, manifests do not contain sufficient detail to indicate the exact contents maintained under a given subject. Once potentially responsive material is located, the entire contents of the box or the electronic file must be searched.

25.     An IPS Government Information Specialist, who was knowledgeable of the FOIA request at issue, conducted a search of RIMS using the search term "Robert Bales." The search was limited to the date range, March 1, 2012, to December 31, 2013. As a result of this search, IPS identified three boxes of potentially responsive retired paper files that were manually searched for any documents responsive to Plaintiff's request.

26.     An IPS Government Information Specialist conducted a second search of RIMS for any retired files belonging to former Department officials and Ambassadors to Afghanistan. The archived e-mail records of Ambassador James Cunningham, Ambassador Ryan Crocker,

8

Ambassador Peter M. McKinley, and Deputy Chief of Mission David Lindwall were identified as potentially containing responsive records. The IPS Specialist searched for the following terms in those records:

- "Robert Bales"
- "Mullah Baraan"
- "Hikmatullah"
- "Rafiullah"
- "Haji Baqi"
- "Haji Mohammad Wazir"
- "Dost Mohammad"
- "Naimatullah"
- "Bales" AND "Afghanistan"
- "Bales" AND "Afghan"

The search was limited to the date range, January 1, 2012, to December 31, 2013.

27.     As a result of these searches, the Specialist found no retired records responsive to Plaintiff's request.

### State Archiving System

28.     The State Archiving System ("SAS") provides the capability to query over 40 million records through a single interface. These records include those documents that discuss or define foreign policy, set precedents, or require action or use by more than one office. More specifically, SAS provides search capability and access to (a) the official record copies of almost all incoming and outgoing cables between the Department and Foreign Service posts; (b) diplomatic notes; (c) correspondence to and from the White House, members of Congress, and other federal agencies; (d) position papers and reports; (e) memoranda of conversations; (f) and interoffice memoranda. The records contained within SAS are commonly referred to as the "Central Foreign Policy Records" or "Central File." SAS generally allows the Department to conduct full-text searches of records. For all documents in the Central File that are not directly

full-text searchable through SAS, including some older correspondence, SAS will search the text

of a customized reference index that directs a searcher to a full copy of the document.

29.     An IPS Government Information Specialist, who was knowledgeable of both the

FOIA request at issue and the SAS record system, conducted a search of SAS using the terms:

- "Robert Bales"
- "Hikmatullah"
- "Rafiullah"
- "Haji Baqi"
- "Haji Mohammad Wazir"
- "Dost Mohammad"
- "Naimatullah"
- "Mullah Baraan"
- "Bales" AND "Afghanistan"
- "Bales" AND "Afghan"

The search was limited to the date range, January 1, 2012, to December 31, 2013.

30.     As a result of these searches, the Department found no records responsive to

Plaintiff's request.

### III. CORRESPONDENCE WITH PLAINTIFF

31.     On June 5, 2019, the Department provided Plaintiff with a draft search declaration,

which described the searches that the Department conducted in response to the FOIA request in

this case.   The descriptions of the Department's searches in that draft declaration were

substantively identical to the descriptions provided above in paragraphs 10-30 of this Declaration.

The draft search declaration also included four paragraphs that explained the Department's *Glomar*

response to the portion of Plaintiff's request that sought visa records.   Those four paragraphs,

which were numbered paragraphs 26-29 in the draft search declaration, addressed only the portion

of Plaintiff's request that sought visa records for the seven individuals listed in the request.   Those

four paragraphs explained that disclosing the existence or non-existence of visa records about

specific individuals would reveal information exempt from disclosure under FOIA Exemptions 3 and 6.

32.     On July 3, 2019, counsel for Plaintiff informed counsel for the Department (**Exhibit 4**) that Plaintiff did not "intend to litigate the propriety, thoroughness, or scope of the State Department's search for responsive records," and that Plaintiff was instead "focused on" the documents "the State Department claims to be prohibited from disclosure in paragraphs 26-29 of the draft declaration." *See also* Joint Status Report, ECF 11 at 1 (July 3, 2019).  In a Joint Status Report filed later that same day, counsel for Plaintiff confirmed that the only aspect of the Department's processing of this request that Plaintiff would challenge was the Department's "Glomar response to [Plaintiff's] request for visa records for seven individuals listed in Plaintiff's FOIA request." *Id.*

## IV. THE DEPARTMENT'S *GLOMAR* DETERMINATION

### The Existence or Nonexistence of the Visa Records Sought Reflects Information Exempt from Disclosure Pursuant to FOIA Exemptions 3 and 6

33.     The Department receives thousands of FOIA requests every year.  In the typical case, as noted above, IPS evaluates an incoming request and determines which offices, overseas posts, or other records systems within the Department are reasonably likely to contain the records requested.  IPS then tasks those offices and overseas posts with conducting a search for records responsive to the FOIA request.  If responsive records are retrieved, IPS then reviews those records to determine whether they may be released to the requester or whether they must be withheld pursuant to applicable FOIA exemptions.

34.     In some rare cases, however, the mere confirmation or denial of the existence of responsive records would reveal information exempt from disclosure under an applicable FOIA exemption.  While such matters are not frequently encountered in FOIA requests, the Department

must respond to all such requests by neither confirming nor denying the existence of responsive records. This is referred to as a *Glomar* response. *See Wolf v. C.I.A.*, 473 F.3d 370, 374 (D.C. Cir. 2007).

35.     In this case, the existence or nonexistence of records responsive to Plaintiff's request for visa records for the seven individuals listed in the request is exempt from disclosure under FOIA Exemption 3, 5 U.S.C. § 552(b)(3), and FOIA Exemption 6, 5 U.S.C. § 552(b)(6). Any other approach—*i.e.*, confirming the existence of responsive records or denying the existence of responsive records—would reveal information exempt from disclosure under the FOIA.

## FOIA Exemption 3

36.     Disclosing the existence of visa records about a specific individual to a third party would reveal information that must be kept confidential under Section 222(f) of the Immigration and Nationality Act. For example, disclosing that the Department possesses visa records about a specific individual would reveal that the individual has applied for a visa and has necessarily been issued or refused a visa—which are both facts that Section 222(f) requires to be kept confidential. Every visa application must be adjudicated, resulting in either issuance or denial of a visa. As a result, acknowledging the existence of a visa application inherently acknowledges that a visa was either issued or denied, which the Department may not do.

37.     A *Glomar* response is not effective unless it is used for all similar requests, regardless of whether the Department possesses responsive records. If the Department provided a "no records" response to its first nine requests for visa records, it could not then respond to the tenth request, for which records in fact do exist, by "refusing to confirm or deny" the existence of visa records, without, in effect, disclosing that visa records exist, which is the very fact sought to be protected. Accordingly, the Department must consistently provide *Glomar* responses to any

request for visa records about specific individuals, regardless of whether the Department actually possesses such records.

38.     Even if the Department possessed responsive records and could disclose that fact, it still would not be able to disclose the number of visa records in the Department's possession or provide descriptions of those records in a *Vaughn* index, let alone produce the records.  Disclosing the number of responsive records or describing those records in a *Vaughn* index would reveal whether the Department's decision was routine or atypical:  A small number of records would reveal that the decision was routine, while a large number of records would reveal that the decision was closer or more complex.  Similarly, describing visa records in a standard *Vaughn* index would reveal details regarding whether the decision to grant or deny the application was made solely by a consular officer or was elevated to other individuals within the Department, whether interagency consultation was required, and how long any such consultations took to complete.  Section 222(f) requires the Department to maintain the confidentiality of that information.

## FOIA Exemption 6

39.     FOIA Exemption 6, 5 U.S.C. § 552(b)(6), states that the FOIA "does not apply to matters that are personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

40.     When information withheld under FOIA Exemption 6 identifies a specific individual, a personal privacy interest exists in the information.  I am required, therefore, to determine whether there exists any public interest in disclosure and, if a public interest is implicated, to weigh any such interest against the privacy interest to determine whether disclosure would constitute a clearly unwarranted invasion of personal privacy.

41.     With respect to visa records about a specific individual, I have concluded that disclosure of the existence or non-existence of such records to a third party would result in a clearly

unwarranted invasion of the subject of the record's personal privacy. An individual has a significant privacy interest in his or her own immigration status, including whether he or she has applied for or been granted a visa. If the Department disclosed that it possessed visa records about a specific individual, it would necessarily reveal that the individual had applied for a visa or permit to enter the United States, thereby undermining the individual's privacy interest in that information. Conversely, if Defendant disclosed that it did not possess any visa records about that individual, doing so could reveal that an individual was in the country illegally or reveal other information about that person's immigration status, which would reveal private information and could subject the individual to harassment. In either case, the government's response would reveal information in which the subject of the request has a significant privacy interest.

42.      My general determination about the substantial privacy interests in a specific individual's visa records applies with extra force in this case. Plaintiff seeks visa records about seven Afghan civilians who testified at his court-martial proceedings and who were victims of the events leading to the court-martial proceedings. Because of their role as witnesses and victims, protecting their privacy interests is of paramount importance.

43.      I have also concluded that this privacy interest outweighs any minimal public interest in whether a particular individual applied for a visa, any minimal public interest in whether the Department granted that individual's visa request, and any minimal public interest in any details about the processing of that visa request. Accordingly, I have determined that the privacy interests in whether the Department possesses visa records about the seven individuals at issue here clearly outweigh any public interest in disclosure of such information.

### III. CONCLUSION

44.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ___2nd___ day of August 2019, Washington, D.C.


Eric F. Stein

# EXHIBIT  1



Maher Legal Services PC

F. 2017-17207
Supplemental Info

September 18, 2018

Sent via U.S. First-Class Mail to:

U. S. Department of State
Office of Information Programs and Services
A/GIS/IPS/RL
SA-2, Suite 8100
Washington, D. C. 20522-0208

Re: Request on Behalf of Staff Sergeant Robert Bales

Dear Madam or Sir:

This firm represents Staff Sergeant (SSG) Robert Bales, who is presently confined to the U.S. Disciplinary Barracks in Fort Leavenworth, Kansas. On behalf of our client, SSG Bales, we respectfully submit this request for documents pursuant to the Freedom of Information Act, 5 U.S.C. § 552. **The documents requested herein are encompassed within documents that were the subject of a request made on October 25, 2017, by Kathryn Kurinsky, Reference No. F-2017-16570, which was dismissed and re-opened as Reference No. 2017-17207.** The present request is more narrow than the request that was the subject of F-2017-16750, new number F-2017-17207, in that the present request does not seek documents related to studies of the drug mefloquine.

Specifically, we respectfully request **travel records** and **biometric data/evidence** related to Afghan witnesses the U.S. Army and the ("DoS" or "State Department") brought to the United States in the Army's court-martial, *United States v. SSG Robert Bales*, Docket Number ARMY 20130743, which occurred on January 17, April 23, June 5, and August 7, 13, and 19-23, 2013, on Joint Base Lewis McChord in the state of Washington. The specific documents we request would fall within the dates ranging from March 1, 2012, through December 31, 2013. We believe these documents are in the State Department's possession because the prosecutors in the case stated in open court that they were working with the State Department to secure the presence of the Afghan witnesses in the United States. (*See* Record of Trial, pp. 407 – 412). To assist the State Department in locating these documents, a detailed description of the documents sought and locations where they may be obtained is provided below.

I.    TRAVEL RECORDS PERTAINING TO THE SEVEN AFGHAN WITNESSES.

We respectfully request travel records in the State Department's possession related to the following individuals of apparent Afghan descent and citizenship ("the Afghan witnesses"):

> 1. Mullah Baraan (Prosecution witness 1) is tied to an IED event that occurred 7 January 2010 in Helmand Province. His biometric identification number is B28JMS3P2 and he shares the same cell phone as Hikmatullah (Prosecution witness 2).

'18 SEP 25 PM3:55

SSG Robert Bales
FOIA Request to State Department
Page 2

2. Hikmatullah (Prosecution witness 2), is linked to two IED events in Panjawai, Afghanistan, occurring in 2011 and 2012 respectively. His biometric identification number is B28JPGYG6.

3. Rafiullah (Prosecution witness 5) is linked to and IED event occurring on 28 October 2012 in Panjawai, Afghanistan. His biometric identification number is B2JKMH83. The US Government matched Rafiullah to this event on 13 March 2013.

4. Haji Baqi (Brother of prosecution witness 8), is tied to an IED event that occurred on 14 October 2010 in Panjawai, Afghanistan. His biometric identification number is B28JMV6XE.

5. Haji Mohammad Wazir (Prosecution witness 12) had Taliban tattoos on his hand. Wazir is believed to be the leader of this insurgent cell.

6. Dost Mohammad (Prosecution witness 13), is tied to two, 2011 IED events occurring in Kandahar, Afghanistan. His biometric identification number is B2JK4VVSS.

7. Naimatullah (Prosecution witness 16), is responsible for two IEDs occurring in the Zhary and Panjawai Districts of Afghanistan in 2011 and 2012, respectively. His biometric identification number is B28JQ5GGR.

The U.S. Army, by and through the Office of the Staff Judge Advocate, I Corps ("I Corps SJA"), at Joint Base Lewis-McChord, coordinated with the State Department to facilitate the travel from Panjwai and Zharay Districts, Kandahar Provence, Afghanistan, to the United States in the summer of 2013. Importantly, because the Afghan witnesses' travel was coordinated by the Army and State Department, and not requested by the Afghan witnesses themselves, we do not consider this request to be one for "personal information," the likes of which would be provided to the State Department in the ordinary course of a foreign national who requests a visa.

Provided below is a description of the types of documents this request encompasses, and additional background that should provide helpful in searching for responsive documents.

A.    Visa, Passport, and other Travel-Related Documents.

The response to this request should include visas issued to the Afghan witnesses, and accompanying travel documents. The visas for entry into the United States for each individual were issued in Kabul on July 2, 2013 and were valid through September 29, 2013. The passports for each individual were issued by the Government of the Islamic Republic of Afghanistan, Ministry of the Interior, Central Passport Department. We believe the Afghan witnesses flew on Delta Airlines Flight 7 on August 17, 2013, which departed DUBAI, UAE and arrived in



SSG Robert Bales
FOIA Request to State Department
Page 3

Atlanta, Georgia, USA on August 18, 2013, with onward travel to Seattle, Washington. The exit flight from the United States is believed to have occurred the last week of August 2013 with Dulles Airport being the point of exit.

Additional specificity concerning the travel of the Afghan citizens is as follows:

19. REMARKS (Use this space for special requirements, leave, excess baggage, accommodations, registration fees, etc.)

Travelers and pseudo SSANs are listed below. This is invitational travel for Afghan civilian employees. Foreign Flag Carrier is authorized. Travelers are exempt from the mandatory provisions of the TTRA. GOVCC CBA is authorized for commercial airline tickets billed directly to the government and are NOT reimbursable to the travelers. Use of the Contract Ticket Office to arrange official travel is mandatory. Lodging at Joint Base Lewis-McChord will be provided at no cost to the travelers. All ground transportation will be provided by the government at no cost to the travelers and is directed. Submission of travel claims for meals, incidental & misc. expenses and required lodging enroute shall be submitted within five (5) working days of return to Afghanistan. An authorized delay in Dubai is approved to allow the necessary procurement of lodging during the layover, changing the per diem rate for per diem on day in Dubai on the return date. Baggage fees authorized. Variation is authorized.

| Last Names | First Names | Middle Name | DOB | Gender | Pseudo SSAN |
|---|---|---|---|---|---|
| NOORZAI | BARAN | JAN | | M | |
| NOORZAI | MOHAMMAD | NAEEM | | M | |
| NOORZAI | FAIZULLAH | NMN | | M | |
| ACHEKZAI | SAYED | JAN | | M | |
| ACHEKZAI | MOHAMMAD | WAZIR | | M | |
| ACHEKZAI | KAMALLUDDIN | NMN | | M | |

(CONTINUED ON REVERSE)

19. REMARKS (Continued) (Use this space for special requirements, leave, excess baggage, accommodations, registration fees, etc.)

| Last Name | First Name | Middle Name | DOB | Gender | Pseudo SSAN |
|---|---|---|---|---|---|
| HAKMATULLAH | PNU | NMN | | M | |
| SADIQULLAH | PNU | NMN | | M | |
| RAFIULLAH | PNU | NMN | | M | |

Further, the response to this request should also include any and all endorsements presented to and/or signed by the military and/or civilian government approval authorities for the travel of the Afghan witnesses. This request expressly includes documents (e.g., email messages or other correspondence) discussing the use of "pseudo SSANs" for the Afghan witnesses, referring to the Afghan witnesses as "Afghan civilian employees," and exempting the Afghan witnesses from the mandatory provisions of the Travel and Transportation Reform Act of 1998.

B.    Correspondence between the State Department and the Army I Corps SJA

Further, the response to this request should also include any and all emails and/or correspondence between the US Army (Office of the Staff Judge Advocate, I Corps, Joint Base Lewis-McChord, Washington) prosecution and the State Department relating to statements the lead prosecutor made in open court about Mullah Barran being biometrically enrolled and having been a former coalition detainee in Afghanistan. Specifically, we seek copies of correspondence, including email messages, the lead prosecutor relied upon when he spoke in open court to the judge presiding over the trial.

C.    Representations made on behalf of the United States to Afghanistan

The response should likewise include: 1) any and all DOS communications to the Government of the Islamic Republic of Afghanistan concerning SSG Bales after the March 2012 incident in Panjwai in Kandahar province, Afghanistan, but before the trial in August 2013; and



SSG Robert Bales
FOIA Request to State Department
Page 5

A.   The State Department's Use of Biometrics in Afghanistan

"Biometrics in Afghanistan centers on denying the enemy anonymity among the populace." Center for Army Lessons Learned, *Commander's Guide to Biometrics in Afghanistan – Observations, Insights, and Lessons* (No. 11-25, 2011) at 37. "Biometrics is a decisive battlefield capability being used with increasing intensity and success across Afghanistan. It effectively identifies insurgents, verifies local and third-country nationals accessing our bases and facilities, and links people to events." *Id.* at (i).

"Biometrics allows an almost foolproof means of identification that is noninvasive yet extraordinarily accurate." *Id.* at 23. Soldiers carrying enrollment devices in their kits, called BAT, for Biometrics Automated Toolset, and/or HIIDE, for Handheld Interagency Identity Detection Equipment. *Id.* at 50, 61. Upon biometrics enrollment, the person is assigned a biometric enrollment number, their fingerprints and photograph are taken, an iris scan is performed, DNA is secured, personal data is obtained, all uploaded as a template. The biometrics enrollment is transmitted to the authoritative database – Automated Biometrics Identification System (ABIS) or (A-ABIS) Afghanistan Automated Biometrics Identification System, where it is stored for later reference. *Id.* at 47; 61.

Biometric data is particularly useful in our forces' battle against improvised explosive devices (IEDs).  When an IED event occurs, be it an explosion or where forces discover and diffuse the bomb, the GRID coordinate is recorded, the event is assigned an "IED event number" and the IED components are exploited for biometrics, *i.e.*, DNA from skin left on wires when the terrorist twists the wires or fingerprints left on components. Latent fingerprints recovered from bomb parts and then compared, or "exploited," to templates already within ABIS or A-ABIS stored from previous enrollments. A "match" is often referred to as a "hit."

B.   The Locations Where the Records Can Be Reasonably Found and Retrieved

The State Department routinely uses the following biometrics resources as part of interagency cooperation and operations in Afghanistan to identify and confirm Afghan identities and terror affiliations:

1) the Automated Biometrics Identification System (ABIS);
2) Federal Bureau of Investigation Integrated Automated Fingerprint Identification System (IAFIS);
3) Department of Homeland Security's (DHS) Automated Biometrics Identification System; (IDENT);
4) National Ground Intelligence Center's Automated Identification Management System (AIMS);
5) Biometrics Enterprise Core Capability (successor to ABIS);
6) Biometric Automated Tool Set (BATS);
7) Biometric intelligence analysis report or (BRIARs);
8) Defense Biometrics Identification System (DBIDS);
9) DOD Automated Biometric Information System (DOD ABIS);
10) FBI Electronic Biometric Transmission Specification (FBI EBTS);



SSG Robert Bales
FOIA Request to State Department
Page 6

11) US Visitor and Immigrant Status Indicator Technology (US-VISIT);
12) United States Army Criminal Investigation Laboratory (USACIL);
13) Biometrics Identity Management Agency (BIMA);
14) International Criminal Police Organization's (INTERPOL) biometrics
   holdings;
15) NIPRNET architecture at http://id.socom.mil; and
16) US Special Operations Biometrics Analysis and Coordination Cell
   (BACC).

Use of these systems and databases is straightforward, common, and often less complicated than a Google or Lexis-Nexis search.

Further, we recognize that the FOIA does not require agencies to create records. However, the aforementioned biometrics servers and databases contain the records sought. The following DOS components with access to responsive records/information include, but are not limited to:

1) Kabul Embassy;
2) International Narcotics and Law Enforcement (INL);
3) Conflict & Stabilization Operations (CSO);
4) Counterterrorism (CT);
5) Office to Monitor and Combat Trafficking in Persons (TIP);
6) Office of Global Criminal Justice (GCJ);
7) South and Central Asian Affairs (SCA); and
8) Personnel assigned to Hartsfield International Airport in Atlanta, Georgia,
   and Dulles International Airport in northern Virginia.

\*  \*  \*  \*

If the fee in this matter is estimated to exceed $1,000, kindly advise us before you proceed. We look forward to your determination and disclosure of the documents requested, ideally in electronic format, within the timeframe set forth by law, regulation, and DOS policy. We look forward to working with you in seeking a successful conclusion to the search for responsive documents. To that end, if questions or concerns arise during the process, please contact Kevin Mikolashek at kevinmikolashek@maherlegalservices.com or at (703) 298-2891; or John Maher at johnmaher@maherlegalservices.com or at (312) 804-9912. Thank you very much for your consideration.

Sincerely,

JOHN N. MAHER
KEVIN J. MIKOLASHEK
MAHER LEGAL SERVICES, P.C.



# EXHIBIT  2



**United States Department of State**

*Washington, D.C.   2052*

April 11, 2019

Case #: F-2019-03589

John Maher
Maher Legal Services PC
7 East Main Street, Number 1053
St. Charles, Illinois 60174

Dear Mr. Maher:

Thank you for your request dated September 18, 2018, under the Freedom of Information Act in which you are asking for information related to seven Afghan individuals, including any visa records for these individuals from 2013.

Visa records are confidential under section 222(f) of the Immigration and Nationality Act, 8 USC 1202(f). Consequently, all visa records, including whether any visa records exist relative to a particular individual, are exempt from disclosure under exemption (b)(3) of the Freedom of Information Act, 5 U.S.C. § 552(b)(3). The Department interprets the law to permit us to disclose certain visa-related information, such as a visa application or immigration petition, to the subject of a record who provided the record to the Department. Because your FOIA request does not include authorization from the subject of the record, we cannot disclose any visa records or any information concerning the possible existence or absence of any records.

If you have any questions, you may contact Paul Cirino, Assistant United States Attorney, at paul.cirino@usdoj.gov or (202) 252-2529. Please refer to the case number, F-2019-03589, and the civil action number, 18-cv-2779, in all correspondence about this case.

Sincerely,

Susan C. Weetman
Chief, Office of Programs and Policies
Office of Information Programs and Services

# EXHIBIT  3



**United States Department of State**

*Washington, D.C.  20520*

April 29, 2019
Case No.:    F-2019-03589

Mr. John N. Maher
Maher Legal Services PC
7 East Main Street, Number 1053
St. Charles, Illinois 60174

Dear Mr. Maher:

In response to your client's request dated September 18, 2018, under the Freedom of Information Act (the "FOIA"), 5 U.S.C. § 552, the Department has completed its searches for documents responsive to all parts of your request that do not implicate information for which the possible existence or absence of records is protected from disclosure under section 222(f) of the Immigration and Nationality Act, 8 U.S.C. § 1202(f).  We located no responsive records.

This concludes the processing of your request.  If you have any questions, you may contact Paul Cirino, Assistant United States Attorney, at paul.cirino@usdoj.gov or (202) 252-2529.  Please refer to the case number, F-2019-03589, and the civil action number, 18-cv-2779, in all correspondence about this case.

Sincerely,

Susan C. Weetman,
Chief, Programs and Policies Division
Office of Information Programs and Services

# EXHIBIT  4

| | |
|---|---|
| **From:** | Kevin Mikolashek |
| **To:** | Cirino_Paul (USADC) |
| **Cc:** | Kevin Mikolashek; John Maher |
| **Subject:** | Re: Bales v. State, No. 18-2779 |
| **Date:** | Wednesday, July 3, 2019 12:27:03 PM |
| **Attachments:** | Bales MTN for Appellate Discovery.pdf |

Paul,

Thank you for your consideration, and your thoughtful approach to this. We appreciate working with you to get the documents were are seeking without adding any extraneous work to you or the State Department. We appreciate you sending the draft declaration detailing the search. We still believe the State Department has documents we need and are entitled to receive, and therefore there may be the need for briefing. As we discussed when we last spoke, we propose to limit the scope of the briefing.

To the extent the State Department has conducted a search and avers that there are no responsive documents, we accept the State Department lawyers at their word. We do not intend to litigate the propriety, thoroughness, or scope of the State Department's search for responsive records in the following sources, described in the draft declaration: the Bureau of Diplomatic Security (paras. 10-12); Retired Files (paras. 12-16); Department of State Archiving System (paras. 17-19); the Bureau of South & Central Asian Affairs (paras. 20-22); or the Embassy in Kabul (paras. 23-25). We see no need to have you or the State Department go through the exercise of describing the search to the Court, and the fact that there are no responsive documents.

The documents we are focused on are those the State Department claims to be prohibited from disclosure in paragraphs 26-29 of the draft declaration you provided. We believe these documents are responsive to our request, and are available to/or are in the possession of the State Department. More specifically, we believe the State Department has records, whether in the form of Visa applications or biometric evidence, of these individuals:

Hikmatullah (Prosecution Witness 2)
Biometric ID No.: ███████
Linked to two IED events in Panjawai, Afghanistan, in 2011 and 2012

Rafiullah (Prosecution Witness 5)
Biometric ID No. ███████
Linked to IED Event No. 1213538, in Panjawai, Afghanistan, Oct. 28, 2012

Haji Baqi (Prosecution Witness 8)
Biometric ID No. ███████
Linked to IED Event that occurred Oct. 14, 2010 in Panjawai, Afghanistan

Sediqullah (Prosecution Witness 11)
Biometric ID No. ███████
Linked to IED Events that occurred  in 2012 in Panjawai, Afghanistan

Haji Mohammad Wazir (Prosecution Witness 12)
Linked to IED events that occurred in Afghanistan, and other terror attacks.

Dost Mohammad (Prosecution Witness 13)
Linked to two IED attacks near Kandahar, Afghanistan

Naimatullah (Prosecution Witness 16)
Biometric ID No. ███████
Linked to two IED attacks in Zhary and Panjawai Districts, Afghanistan, 2011-2012

Additional background is in the attached memorandum filed with the U.S. Army Court of Criminal Appeals. The records pertaining to these individuals are those we are looking for.  At this point, do you think it would be most appropriate to enter into a briefing schedule to litigate whether we are entitled to these, or do you think it would be fruitful for the State Department to take some more time to determine whether they would be willing to provide these?

Best regards,

Kevin Mikolashek

www.lawyersforcorporatewarriors.com

www.lawyersdefendingwarriors.com

mobile: (703) 298-2891


On Mon, Jul 1, 2019 at 10:55 AM Cirino, Paul (USADC) <Paul.Cirino@usdoj.gov> wrote:

> Kevin,
>
> Have you had a chance to consider the issues that we discussed a couple of weeks ago?  I'm happy to draft the JSR due on Wednesday if you can give me a sense of what your plans are.  Thanks
>
> Paul
>
> **From:** Kevin Mikolashek <kevin@maherlegalservices.com>
> **Sent:** Wednesday, June 19, 2019 2:09 PM
> **To:** Cirino, Paul (USADC) <PCirino@usa.doj.gov>
> **Cc:** Kevin Mikolashek <kevinmikolashek@maherlegalservices.com>; John Maher <johnmaher@maherlegalservices.com>
> **Subject:** Re: Bales v. State, No. 18-2779
>
> Paul,
>
> Thank you for putting this together, and for our conversation earlier this afternoon.  You indeed have our consent to sign and file on our behalf.
>
> Best regards,
>
> Kevin M kolashek
>
> www.lawyersforcorporatewarriors.com
>
> www.lawyersdefendingwarriors.com
>
> mobile: (703) 298-2891
>
>
> On Wed, Jun 19, 2019 at 2:07 PM Cirino, Paul (USADC) <Paul.Cirino@usdoj.gov> wrote:
>
>> Kevin,
>>
>> I have attached a draft Joint Status Report that reflects our conversation this afternoon.  Please let me know if you have any issues, or that I am authorized to file on your behalf.  Thanks for your cooperation.